Qaid Rafeeq AZEEZ and Abdullah Muhammad, Plaintiffs-Appellees,

v.

James W. FAIRMAN, warden, John E. Wright, asst. warden, and A. Dodge, #120 (C.O.), Defendants-Appellants.

No. 85–1330.

United States Court of Appeals, Seventh Circuit.

Argued May 9, 1986.

Decided June 30, 1986.

William D. Frazier, Atty. Gen., Chicago, Ill., for defendants-appellants.

Jamie Kittel, Chicago, Ill., for plaintiffs-appellees.

Before POSNER and EASTERBROOK, Circuit Judges, and CAMPBELL, Senior District Judge.[*]

POSNER, Circuit Judge.

The plaintiffs, Qaid Rafeeq Azeez and Abdullah Muhammad, brought suit under 42 U.S.C. § 1983 against the warden and

* Honorable William J. Campbell, of the Northern District of Illinois, sitting by designation.

other officials of the Pontiac Correctional Center, which is Illinois' maximum-security prison, charging that the defendants had deprived the plaintiffs of their religious freedom by refusing to recognize their Islamic names. After a bench trial the district judge ruled in favor of the plaintiffs and entered judgments of $150 for each plaintiff, from which the defendants appeal.

Azeez and Muhammad were committed to Pontiac under the names Stanley Russell and Jessie Fields. They later converted to Islam and adopted their present names. Russell changed his name by means of the statutory procedure provided for this purpose. Ill.Rev.Stat. ch. 96. Fields just started calling himself Abdullah Muhammad. The defendants gave the plaintiffs "a/k/a" cards listing both their "committed" and their new names, but at times refused to let either plaintiff sign for various rights or privileges (such as library access, access to religious and notarial services, and commissary—i.e., snacks, cigarettes) in their Islamic names. The defendants also deprived the plaintiffs of these rights from time to time as punishment for the plaintiffs' refusing to sign their "committed" names. At other times, however, punishment was for their refusing to use the cards merely because their "committed" names were listed before their Islamic names.

The defendants do not contest the district court's finding that $150 is a reasonable amount of money to compensate each of the plaintiffs for not being allowed to sign his Islamic instead of his "committed" name, assuming such refusal was unlawful. Nor do the defendants deny, at least for purposes of this appeal, that they should have recognized Azeez's name change because he followed the prescribed statutory procedure. Rather, they argue that they are immune from having to pay damages to Azeez because they acted in good faith in refusing to recognize his name change, and that they did not violate Muhammad's constitutional rights at all.

A curiosity of the appeal is the defendants' asking us to set aside the declaratory relief that the district judge granted Muhammad, and Muhammad's vigorous opposition to that request. The judge did state in his opinion that he would enter a declaratory judgment, but the actual judgment entered reads in its entirety: "judgment entered in favor of the pltfs & against the dfts in the sum of $300 for deprivation of their religious liberties." There is not a word about declaratory relief. A litigant cannot appeal from a statement of intention to enter a judgment, as distinct from the judgment itself. Rule 58 of the Federal Rules of Civil Procedure says that the judgment must appear on a separate piece of paper—separate, that is, from the court's opinion. We take this requirement seriously. See, e.g., *Stelpflug v. Federal Land Bank,* 790 F.2d 47 (7th Cir.1986) (per curiam). As there was no declaratory *judgment,* there is no issue before us concerning the propriety of declaratory relief. Furthermore, a footnote in the defendants' brief states without contradiction, and the parties confirmed at oral argument, that Muhammad has been released from prison. He has no interest— no interest recognized by federal law, in any event—in obtaining a declaratory judgment concerning the religious liberties that he would be entitled to if he were in prison.

The parties' desire to have us resolve an issue that is not within our power to decide troubles us deeply. The federal courts must confine themselves to the jurisdiction, which is ample, that the Constitution gives them. Counsel must help us to carry out this duty. The determination of the propriety of a declaratory judgment, in a case in which such a judgment was never entered and would be moot if it had been, is not within that jurisdiction.

The award of damages, however, prevents the entire case from being moot, and requires us to consider two substantive issues: whether state prison officials can insist that a prisoner (Muhammad) use a statutory procedure for changing his name before they will recognize the name change, even if the change of name has a

religious motivation; and whether they are immune from being held liable in damages for having refused to recognize a name change (Azeez's) made by means of the statutory procedure.

■ The district judge found, and the defendants do not challenge the finding, that the plaintiffs changed their names for sincere religious reasons and that it is offensive to their religious beliefs to be forced to sign their old names for any purpose. This is as true for Muhammad as for Azeez, even though Muhammad never attempted to change his name by the statutory means. It is also uncontested that a citizen of Illinois, which Muhammad (like Azeez) is, has a common law right to change his name. *Reinken v. Reinken*, 351 Ill. 409, 184 N.E. 639 (1933). The defendants' position, therefore, so far as Muhammad's case is concerned, is that considerations of prison discipline and security justify curtailing a prisoner's common law right to change his name, even when his motivation for exercising that right is religious.

There was a time when federal courts did not intervene in the internal affairs of prisons at all. (cf. *Ruffin v. Commonwealth*, 62 Va. (21 Gratt.) 790, 796 (1871)), and though that time is past, even today these courts regulate prisons with a considerably lighter touch than they regulate other public institutions alleged to deprive their charges or wards or employees of federal constitutional rights; see our extensive recent discussion of cases in *Caldwell v. Miller*, 790 F.2d 589, 595–600 (7th Cir.1986), another case involving prisoners' religious liberties. The security problems of present-day maximum-security prisons are acute. See, e.g., *United States v. Silverstein*, 732 F.2d 1338 (7th Cir.1984); *United States v. Fountain*, 768 F.2d 790 (7th Cir. 1985). Recently we noted that "Pontiac is a den of murderers, rapists, and others with no respect for the law—and all too often nothing to lose from further mayhem." *Walker v. Rowe*, 791 F.2d 507, 512 (7th Cir.1986). We have therefore insisted that district judges in this circuit give great

though not complete deference to the decisions of the prison authorities on matters affecting the maintenance of order. "We accord, as we must, prison officials wide-ranging deference in adopting policies that are needed to preserve internal order and security." *Caldwell v. Miller, supra,* 790 F.2d at 596.

Although the district court's opinion recognizes that Muhammad was not entitled to mutilate his identification card, threaten prison staff, and require that his name be changed on prison records, it does not recognize the practical difficulties that enforcing the common law right to change one's name would create for the prison authorities. Prisoners in maximum-security prisons do not dedicate themselves to making life easier for the guards and wardens. One way in which they can make life more difficult is by changing their names frequently. Every time a prisoner changes his name the prison staff must unlearn the old name and learn the new. If many prisoners happen to change their old names to the same new name (how many "Abdullah Muhammads" are there in the Illinois prison system today, we wonder?), they can cause chaos. Of course prisoners have numbers as well as names, but the plaintiffs' counsel suggested at argument that if a prisoner had religious scruples against being identified by number, these scruples must be honored too. Compare *Bowen v. Roy*, —— U.S. ——, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986). People on the outside rarely change their names (except women upon getting married—and that is changing), because of the confusion that may result. But prisoners may want to cause confusion, and in any event do not pay the same price as a free person who, having changed his name, must inform his friends and business acquaintances and get a new driver's license, credit cards, and so on. The plaintiff in *Salahuddin v. Coughlin*, 591 F.Supp. 353, 358–59 (S.D.N.Y.1984), had two Moslem names (as well as three Christian ones), and "professed contemplation of name changes in the future, which he wants to be able to accomplish at will." *Id.* at 359. So we can imagine a situation

where when roll is called one morning Fields refuses to answer his name because last night he changed it to Muhammad; the next day he changes it to Azeez, and the next back to Fields. How are the authorities to keep track of prisoners in these circumstances?

No doubt our hypothetical case would represent an abuse of the common law right to change one's name. Cf. *Chaney v. Civil Service Comm'n*, 82 Ill.2d 289, 45 Ill.Dec. 146, 412 N.E.2d 497 (1980). But the boundaries of the concept of abusing the common law right to change one's name are obscure, and we do not think it can be said as a matter of federal constitutional law that the common law fixes the boundaries for prison officials alleged to have curtailed the federal rights of inmates. If perchance the prison authorities are violating Muhammad's common law rights, the remedy is a proceeding in Illinois court under Illinois law; an error of state law is not a denial of federal due process. *Lynk v. LaPorte Superior Court No. 2*, 789 F.2d 554, 564 (7th Cir.1986).

To our suggestion that chaos might result if prison inmates could change their names at will and require the prison's staff to recognize the change, the plaintiffs' counsel replied at argument that the record of this case contains no evidence that changes of name by prisoners at Pontiac have caused serious confusion, even though it appears that some years ago a number of black prisoners converted to Islam all at once and adopted Islamic names. But prison authorities are not required to wait for catastrophe before acting. They ought to prepare in advance for confusing or harassing or just too frequent name changes. They ought to have a rule, a policy. The rule that the Pontiac authorities have adopted is that they will recognize only name changes effected by the statutory procedure that Illinois provides for changing one's name. True, they didn't always follow their own rule in Azeez's case, which is why they confine their appeal in his case to the issue of immunity; but their lack of consistent observance does not bar them from invoking the rule as a basis for overturning the judgment in favor of Muhammad. The failure to enforce a rule consistently does not make the rule unconstitutional. See, e.g., *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7 L.Ed.2d 446 (1962); *Hameetman v. City of Chicago*, 776 F.2d 636, 641 (7th Cir.1985).

The rule that requires prisoners at Pontiac to follow the statutory procedure for changing one's name is reasonable, see *Salahuddin v. Coughlin*, *supra*, 591 F.Supp. at 358–59; *Rahman v. Stephenson*, 626 F.Supp. 886, 888 (W.D.Tenn.1986), at least if the procedure is usable by a prisoner, and it was by Muhammad. All the statute requires is that the prisoner have been a resident of Illinois for six months, which Muhammad had been at the time he adopted his Islamic name, that he petition an Illinois court to change his name, and that he publish the name change in a newspaper for a few weeks. The cost of publication might pose an obstacle to some prisoners but it did not to Azeez and there is no suggestion it would have to Muhammad. We need not consider the case of a prisoner who cannot afford to publish, or who cannot use the statutory procedure because he hasn't lived in Illinois for six months.

By requiring inmates to undergo the formalities of the statutory procedure the prison authorities prevent capricious, incessant, casual, sudden, harassing, on-the-spot name changes. Judging by Azeez's experience the formalities are not burdensome, and there is as we just said no suggestion that they would have been a burden for Muhammad. The prison allows prisoners to change their names and only compels them to do so by a procedure designed (imperfectly—but all human institutions, indeed all human undertakings, are imperfect) to weed out the pranksters, the wise guys, the troublemakers, the insincere.

But are these considerations powerful enough to justify impeding the free exercise of religion, a right which the Supreme Court has held state prisoners enjoy by virtue of the First Amendment as read into the Fourteenth Amendment? It is true

that, read literally, the First Amendment (so far as pertinent to this case) seems to prohibit only governmental discrimination against religion or particular religious sects; so understood the amendment would not forbid the application of a general regulation that had been adopted for valid secular reasons to a religious group, whatever the consequences for the group. Recognizing, however, how such an interpretation of the First Amendment would elevate the interests of dominant religious groups over those of minority religious groups—since the normal operation of the political process will assure that governmental regulations do not interfere with the religious practices of the majority—the Supreme Court has held that the government must bend its regulations to accommodate sincere religious practices. See, e.g., *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Thomas v. Review Bd. of Indiana Employment Security Division,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); McConnell, *Accommodation of Religion,* 1985 S.Ct. Rev. 1, 34–40. But how far? No definitive standard has emerged. Compare *Sherbert v. Verner, supra,* 374 U.S. at 403, 406, with *Wisconsin v. Yoder,* 406 U.S. 205, 220, 92 S.Ct. 1526, 1535, 32 L.Ed.2d 15 (1972), and notice the greater receptivity to arguments based on the needs of prison security in our recent *Caldwell* decision, *supra,* than in our earlier decision in *Madyun v. Franzen,* 704 F.2d 954, 960–61 (7th Cir.1983)— though even in *Madyun* we rejected the prisoner's claim and made clear that an inmate "simply cannot expect the same freedom from incidental infringement on the exercise of his religious practices that is enjoyed by those not incarcerated." *Id.* at 958. Maybe in the prison setting the answer to the question how far government must go to accommodate religious beliefs, is, not very far, because of the danger to the other prisoners if the prison authorities lose control and because persons who want to exercise their religious rights without interference can do so just by not committing crimes punishable by imprisonment.

But there is no need to fix on a precise standard in this case, for under any standard Muhammad must lose. The record does not show a significant abridgment of his religious freedom; there may, indeed, have been no abridgment at all. For there is no evidence that requiring an Islamic prisoner to undergo a *nonburdensome* statutory procedure for changing his name imposes a religious hardship on him. Supposing, as we do—because the district judge so found and the defendants do not on this appeal contend otherwise—that Jesse Fields upon converting to Islam was required to adopt an Islamic name, still we find no suggestion that he was required to do so at the moment of conversion. So far as appears, he was required to do so at the first opportune moment—within a reasonable time—and there is no evidence that the time it would have taken him to get a statutory name change would have been thought unreasonable by any of his religious mentors.

We grant that duty and right need not be coextensive in this area; the right to religious freedom may be violated by a public regulation that prevents a practice merely recommended, and not mandatory, for members of a particular faith. See McConnell, *supra,* at 27, 34. But there is no evidence that if told he must use his "committed" name in his dealings with the prison authorities for a brief interval until his statutory name change went through, Muhammad would have thought he was being asked to do something contrary to his religious beliefs.

So this seems to be a case where, as in *Menora v. Illinois High School Ass'n,* 683 F.2d 1030 (7th Cir.1982), the alleged conflict between religious liberty and public safety is a false—nonexistent—imagined conflict, arising from a failure to attend carefully to the specific content of the religious obligation. Just as in *Menora* there was no religious obligation to wear a yarmulke that might fall off because it hadn't been securely fastened and might trip up other basketball players, so in this case there appears to be no religious obligation

to adopt an Islamic name at the moment of conversion to Islam.

If no deprivation of Muhammad's religious liberty has been shown, he must of course lose. But if there was a deprivation, still it was very slight and was outweighed by the benefits in security and good order from insisting that prisoners who want their new names recognized by the prison authorities follow (at least where it is feasible to do so) the simple statutory procedure which Illinois provides for changing one's name.

■ The other question we must decide is whether the defendants are immune from liability to Azeez for having at times refused to let him sign for privileges in his Islamic name even though he had used the statutory procedure to adopt it. This depends on whether the defendants were violating "clearly established ... constitutional rights ... of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Azeez does not seek damages for any violation of his rights under state law, so we need not consider whether by insisting on an "a/k/a" designation or otherwise by continuing to use Azeez's "committed" name the defendants violated rights clearly established by Illinois statute. The only question is whether they violated any clearly established federal constitutional right.

At the relevant time, 1981, the only case that had held that a prisoner had a federal constitutional right both to change his name for religious reasons and to insist that the prison authorities recognize the new name was a district court decision outside of this circuit, *Masjid Muhammad-D.D.C. v. Keve,* 479 F.Supp. 1311, 1321–26 (D.Del.1979); and there was contrary authority, in cases holding that prison authorities do not have to recognize a religiously motivated name change on the prison's internal records, see *Akbar v. Canney,* 634 F.2d 339 (6th Cir.1980) (per curiam); *Smalley v. Bell,* 484 F.Supp. 16, 18 (W.D.Okla. 1979). Such cases may be distinguishable from *Masjid* and the present case; indeed

the plaintiffs in the present case no longer insist that the prison change their names on its books. But it was not clear back in 1981 that such cases would be distinguished and that the line would be drawn between the use of "committed" names for record-keeping and for other purposes.

■ Although it was well recognized in 1981 that prisoners retain their constitutional rights to the extent compatible with the needs of prison discipline and safety, the application of this generality to religiously motivated changes of name in circumstances like those of the present case had yet to be authoritatively determined. The words "clearly established ... constitutional rights" may not be used to read the defense of immunity out of federal tort law by the facile expedient of stating constitutional rights in the most general possible terms, so that anyone who prevails on the merits of a claim based on (for example) the First Amendment's free exercise of religion clause, however novel that claim is, can defeat the defense of immunity simply by pointing out that the right to the free exercise of one's religion has long been a clearly established constitutional right. The right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful.

So the question is whether in 1981, in the absence of any authoritative judicial precedent (for the State of Illinois is not bound to comply with every constitutional ruling by every district judge in the United States, see *Shirley v. Chagrin Falls Exempted Village Schools Bd. of Educ.,* 521 F.2d 1329, 1333–34 (6th Cir.1975); *Benjamin v. Board of Election Comm'rs,* 122 Ill.App.3d 693, 697, 78 Ill.Dec. 507, 462 N.E.2d 626, 628 (1984), especially when as in this case there arguably was contrary authority— some of it at the court of appeals level) dealing with the right of a prisoner to compel recognition of a religiously motivated change of name, that right was clearly established. To ask the question is to answer it. Prison authorities had only slight reason to believe then that the Constitution would be interpreted to forbid them to cur-

tail a prisoner's common law or statutory right to change his name, even if the name change was sincerely motivated by religious belief. The plaintiffs' counsel in this case conceded at argument that some such incursions are constitutional—that the defendants could for example have required Muhammad to put his request for a change of name in writing. So it is all a matter of degree, with Azeez and Muhammad conceding that the common law right can be encroached upon to the extent of requiring a written request to recognize their new names and the defendants insisting (at least in 1981, at least intermittently) that the plaintiffs would have to go by their "committed" names while in prison, at least in dealing with the authorities; the plaintiffs were of course free to use their adopted names as soon as they were released (Muhammad has been released, as we have said), as well as in dealing with other prisoners, family, etc.

Even today it is not obvious that it would violate the Constitution for the defendants to hold to this position. We have not said that the religious claims in this case trump the state's legitimate interest in maintaining prison discipline and safety. Requiring adherence to the statutory procedure does not violate Muhammad's rights, and of course it does not follow that forbidding all changes of names by prisoners violates any prisoner's rights. The test in this circuit for a prison regulation challenged on religious grounds is reasonableness; prison officials are not required to use the least restrictive alternative to attain valid regulatory objectives such as safety. *Caldwell v. Miller, supra,* 790 F.2d at 596 n. 11. Even in 1986 the right to make prison staff recognize a religiously motivated name change in prison is not clearly established, and it certainly was not five years ago; a good illustration of the judicial attitude in that period toward curtailment of religious liberties by prison authorities is *Rogers v. Scurr,* 676 F.2d 1211, 1215 (8th Cir.1982). Granted, *Barrett v. Virginia,* 689 F.2d 498, 503 (4th Cir.1982), invalidated a ban on allowing prisoners to use the statutory procedure for changing one's name; but if

only because *Barrett* postdates the alleged deprivation of Azeez's rights, it is not good evidence that the defendants violated some "clearly established" right of Azeez's. Even today, we doubt that his right could be so described; for we are not sure we agree with *Barrett,* though that is not an issue we need resolve in this case.

The defendants are immune from being ordered to pay damages to Azeez, and they never violated Muhammad's constitutional rights. The judgment for the plaintiffs is reversed with instructions to enter judgment for the defendants.

REVERSED.

CAMPBELL, Senior District Judge, dissenting in part.

I believe we should affirm the damage award given to Azeez and affirm Judge Baker's ruling in this area in doing so. In analyzing this issue, we must follow the principles set forth in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) where it was held:

[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as there conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known.

On May 20, 1981 the Illinois Circuit Court issued a Writ of Mandamus, requested by Azeez, requiring prison officials to "hereinafter conduct all official business with [Azeez] using his new name." To paraphrase *Harlow,* supra, I consider the writ to have clearly established Azeez's constitutional right (at least in Illinois) to be referred to by his new Muslim name. Indeed, on June 1, 1981 Azeez was properly issued an identification card bearing only his Muslim name. Yet later that same day his card was inexplicably confiscated and he was given a card reading "Stanley Russell a/k/a Qaid Rafeez Azeez," clearly indicating officials would still primarily "conduct official business" with him using his old name. Azeez stood up for his rights

after they were clearly established by the Illinois courts. As a result he was denied all privileges for two weeks.

I believe prison officials had due notice from the Illinois courts about the rights of Azeez and callously (if not deliberately) violated them. This kind of callousness should not be condoned and I would affirm Judge Baker's damage award as to Azeez.