**GROVE SCHOOL, et al., Plaintiffs,**

v.

**GUARDIANSHIP AND ADVOCACY COMMISSION, et al., Defendants.**

No. 84 C 2675.

United States District Court, N.D. Illinois, E.D.

Sept. 2, 1986.

See also 596 F.Supp. 1361.

John L. Gubbins, John L. Gubbins & Associates, Ltd., Chicago, Ill., for plaintiffs.

Kathleen T. Kreisel, Asst. Atty. Gen., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Grove School ("School") and its Director Robert Matson ("Matson") initially sued the State of Illinois Guardianship and Advocacy Commission ("Commission") and its employees Elizabeth McKee ("McKee"), Mary Gibb ("Gibb"), Evelyn Engler ("Engler"), Ruth Durkin ("Durkin") and Hector Palacios ("Palacios"), asserting:

1. a claim under 42 U.S.C. § 1983 ("Section 1983") for violations of plaintiffs' First and Fourteenth Amendment rights; [1]

2. the Illinois common-law tort of trade libel; and

3. the Illinois common-law tort of libel;

all arising out of Commission's investigation of Grove's claimed violations of state laws for treatment and education of handicapped children. On October 24, 1984 this Court dismissed all claims against Commission and all due process claims against the individual defendants. Now all the individual defendants have moved under Fed.R. Civ.P. ("Rule") 56 for summary judgment. Their motion is granted:

1. As this Court has frequently had occasion to note, in Section 1983 cases (which by definition are targeted against state actors) it is imprecise to refer to violations of Bill of Rights provisions (which by definition are directed only against the federal government). Instead all such Section 1983 claims are grounded in the Fourteenth Amendment, which has been construed to incorporate Bill of Rights guaranties. Nonetheless there is not much point in swimming against the uniform tide of judicial usage—and indeed, such reference to the First Amendment (despite its technical inaccuracy) is useful in a case such as this, which asserts Fourteenth Amendment claims founded both on its direct guaranty (the Due Process Clause itself) and a derivative guaranty (the First Amendment via the Due Process Clause).

2. Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material

(a) as to Gibb and Palacios, with plaintiffs' consent (P.Mem. 3 n. 1 and 15); and

(b) as to McKee, Engler and Durkin, for the reasons stated in this memorandum opinion and order.

## Facts [2]

On March 1, 1983 [3] Commission received its first complaint against School, charging School did not adequately supervise its residents (Volberding Aff.Ex. A). On March 2 Commission voted to open an investigation of School (Durkin Dep. 68). Between March 2 and March 19 Commission received four additional complaints against School (Volberding Aff. Exs. B–E).

On March 19 McKee, Durkin and three other Commission members visited School (Durkin Dep. 81). Durkin asked Matson twice about his "behavior management philosophy" (Matson Dep. 44). After speaking to Matson the Commission members toured the facility (McKee Dep. 91–95).

On May 18 McKee and two other Commission members again visited School (V. Matson Dep. 41–42). They told Virginia Matson ("Virginia") the substance of some of the complaints Commission had received (id. at 43–44). Virginia responded that the complaints had originated with persons who held a grudge against School and that

fact. *Celotex Corp. v. Catrett*, — U.S. —, —, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). For that purpose, this Court must view the evidence in the light most favorable to the nonmovants—here School and Matson. *Anderson v. Liberty Lobby, Inc.*, — U.S. —, —, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Though this "Facts" section applies those standards, it is limited to subjects involving no disputes as to admissibility. As for the added matters addressed in defendants' Motion To Strike (which disputes the admissibility of some of plaintiffs' exhibits), the resolution of the summary judgment motion in defendants' favor eliminates the need to deal with the merits of that dispute.

3. Except for the final few matters recounted in this statement of facts, all the relevant events occurred in 1983. Accordingly each date given without any year reference should be understood as a 1983 date.

Commission had been "hoaxed" (McKee Dep. 122; Virginia Dep. 43–44).

In June Commission sent letters requesting information from school districts that had placed children at School (P. Exs. 23–24). Commission's letters of inquiry specified some of the complaints it had received about School (*id.*).

At that point Commission members investigating School suggested holding a public hearing on the complaints that had been received (Engler Dep. 47). Engler—the director of the Commission branch investigating School—recommended against a separate public hearing (*id.* at 58–59). She thought Commission would not have enough time to prepare for such a hearing and that it would be "inflammatory" (*id.* at 60). Accordingly Commission scheduled the matter for its regular July meeting (Engler Dep. 80–81; P. Exs. 13, 15).

On July 5 Matson received a notice (dated June 29) informing him of Commission's meeting (Matson Dep. 10–11 and Ex. 1):

> The Human Rights Authority Region 2–North would like to inform you that at its public meeting the Authority will be discussing a report of findings concerning its investigations at Grove School in addition to discussion of reports concerning other facilities.

Matson did not attend the meeting (Matson Dep. 11).

Commission also notified the press of its July meeting, as it does routinely (Engler Dep. 80–81). Its notice stated in part (P.Ex. 16):

> The Grove School in Lake Forest will be a topic of discussion at a meeting of the Human Rights Authority. The Authority, a division of the Illinois Guardianship and Advocacy Commission, has received numerous complaints of violations occurring [sic] at the Grove School, a residential and educational facility for developmentally disabled children and adults. Allegations of physical abuse, unqualified or unlicensed staff, denial of visitation and religious rights, and an unlicensed administrator are among the complaints received by the Authority.

Several newspaper articles about School appeared during the course of Commission's investigation.

On July 6 Commission held its regular meeting, during which Durkin gave an oral interim report on Commission's investigation (Durkin Dep. 125–26). Durkin said Commission had received 25 complaints and had so far substantiated 10 of them (Durkin Dep. Ex. 3). Durkin began to list the remaining complaints still under investigation but then said (*id.*):

> I won't go on with the list, it is too numerous.

On July 12 Commission issued its report on the first 10 complaints investigated (Durkin Dep. Ex. 4). That report also listed 17 complaints still under investigation, including (*id.*):

> 6. School teachers/staff not properly certified.
>
> \* \* \* \* \* \*
>
> 17. Wages paid residents who are "employed" as junior staff do not meet Department of Labor standards.

Much later, in its final report issued August 27, 1984, Commission found "no substantiation" for those two allegations (Engler Dep. Ex. 18).

Commission members visited School twice after the July 6 meeting. On August 24 McKee, Durkin and another Commission member visited School and spoke to Virginia (McKee Dep. 56). On January 25, 1984 McKee, Durkin and another Commission member again visited School (Virginia Dep. 44). Matson asked two state legislators to come to that meeting (Matson Dep. 24). Those legislators questioned the Commission members about their investigation of School (Matson Dep. 26–28). Later that day the Commission members interviewed three School residents (*id.* at 37–38).

As already indicated, Commission issued its final report August 27, 1984 (Engler Dep. Ex. 18). This lawsuit had been filed between the time of the January 1984 events and the August 1984 final report.

## Defendants' Contentions

Defendants attack the Section 1983 claim on three grounds:

1. All defendants are entitled to qualified good-faith immunity because they did not violate any "clearly established" constitutional rights.

2. Plaintiffs cannot prove defendants used their investigation of complaints lodged against School to harass plaintiffs deliberately for having implemented an unorthodox philosophy of treatment of the handicapped.

3. School has not established the necessary direct personal involvement of Gibb or Palacios [4] or Engler.

As to plaintiffs' pendent state-law libel claims, defendants urge:

1. Their statements are not actionable under Illinois law.

2. They are entitled to absolute immunity from damages for those statements.

Defendants have also filed a motion to strike some of the exhibits attached to plaintiffs' memorandum. This opinion need touch only briefly on that motion before turning to a single dispositive substantive contention.

## Motion To Strike

Defendants' motion to strike focuses on P. Exs. 9, 11–18, 21–29 and 31. They first attack as inadmissible hearsay the notes of meetings and phone calls between various Commission members (P. Exs. 9, 11–15, 26–31). They also challenge the authentication of various letters included in plaintiffs' exhibits (P. Exs. 16–18, 21–25).

Examination of the exhibits, defendants' challenges and plaintiffs' responsive memorandum (which did not fully answer defendants' contentions) demonstrates a good deal to be said for and against each side. On the one hand, defendants fail to recognize items of non-hearsay, or exceptions to the hearsay rule, in a number of situations, and

they also fail to distinguish between real and fancied authentication objections in several instances. On the other hand, those failures are matched by plaintiffs' inattention to the commands of Rule 56(e), which properly treats summary judgment evidentiary requirements in just the same way as evidence at the trial the Rule 56 motion is intended to supplant.

This opinion need not be prolonged, however, by resolving those disputes. None of the challenged exhibits, even if treated as admissible and viewed most favorably to plaintiffs, helps their cause here in the terms discussed in the next section. This Court therefore bypasses defendants' motion to strike and goes directly to the dispositive issue in the case.

## Qualified Immunity

All defendants seek insulation from Section 1983 damage liability under the rule of qualified immunity enunciated in *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982):

> We therefore hold that government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Earlier this year *Benson v. Allphin,* 786 F.2d 268, 275–76 (7th Cir.1986) (footnotes omitted) elaborated on that standard:

> Although the Supreme Court has articulated the rule for qualified immunity, it has not fully explained what it means by the phrase "clearly established statutory or constitutional rights." First, it has not specified which court one must look to in determining whether a right is "clearly established," *see Harlow,* 457 U.S. at 818 n. 32, 102 S.Ct. at 2738 n. 32. It seems obvious, however, that reliance on Supreme Court decisions alone might be inappropriate (unless they are the only cases ruling on the question), be-

---

**4.** As already indicated, plaintiffs have now conceded no basis exists for the claims against

those two defendants.

cause they are infrequent in comparison to the decisions of the district and appellate courts, and this infrequency could have the practical effect of converting qualified immunity into absolute immunity.

Second, although it has stated that government officials are not "charged with predicting the future course of constitutional law," *Pierson v. Ray*, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967), the Court has not explained how close the factual correspondence must be between the actions under consideration and the decisions that establish the applicable law. Its decision in *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), suggests, however, that officials are not required to anticipate the extension of existing legal principles.

\* \* \* \* \* \*

It would appear that, whenever a balancing of interests is required, the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability under the [sic] *Harlow*. With *Harlow's* elimination of the inquiry into the actual motivations of the official, *see* 457 U.S. at 815–19, 102 S.Ct. at 2736–39, qualified immunity typically casts a wide net to protect government officials from damage liability whenever balancing is required.

Defendants urge their investigation of complaints lodged against School did not violate any "clearly established" constitutional rights. Plaintiffs answer in two ways. First, their one-page response on the qualified immunity issue (P. Mem. 17) counters by claiming the existence of a material fact question as to whether defendants intended to discredit School's educational program. Second, on the constitutional rights front, plaintiffs say First Amendment principles protect their right to develop an unorthodox method of educating developmentally disabled persons.

For the first of those arguments plaintiffs invoke *Wood v. Strickland*, 420 U.S.

308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975) and the repetition of its doctrine in *Procunier v. Navarette*, 434 U.S. 555, 561–62, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978). But the *subjective* component of the *Wood* "good faith" inquiry—the part on which plaintiffs rely—has not survived. *Benson*, 786 F.2d at 276 makes plain *Harlow* eliminated the inquiry into a state official's actual motivation (except perhaps a motivation to defeat the "clearly established" constitutional right itself). To hold otherwise would be to subject the official to the strife and expense of litigation, defeating the very purpose of the immunity. *Harlow*, 457 U.S. at 816–17, 102 S.Ct. at 2737. Hence plaintiffs' effort to focus on defendants' intent simply misses the mark.

Plaintiffs' second challenge to defendants' immunity defense also fails. *Azeez v. Fairman*, 795 F.2d 1296, 1301–1302 (7th Cir.1986) has recently emphasized a novel invocation of First Amendment principles, such as that advanced by plaintiffs here, cannot overcome a qualified immunity defense:

> The words "clearly established ... constitutional rights" may not be used to read the defense of immunity out of federal tort law by the facile expedient of stating constitutional rights in the most general possible terms, so that anyone who prevails on the merits of a claim based on (for example) the First Amendment's free exercise of religion clause, however novel that claim is, can defeat the defense of immunity simply by pointing out that the right to the free exercise of one's religion has long been a clearly established constitutional right. The right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful.

Of course "clearly established" First Amendment law would protect plaintiffs if they had identified an effort by defendants to stifle plaintiffs' actual articulation and advocacy of an unpopular educational method. And of course that would be true even though plaintiffs could not produce a "white horse" case as precedent: a case

involving public officials' attempts to stifle that particular kind of advocacy, as distinct from advocacy of any other kind of ideas.

But here plaintiffs have offered no evidence to support a claim defendants tried to suppress *speech* in any "clearly established" sense. Instead plaintiffs seek First Amendment protection for their *conduct* —their implementation of an educational program they characterize as reflecting certain philosophical beliefs. There are, to be sure, instances in which conduct may clearly be intended to serve—and is therefore recognized—as "symbolic speech." See, e.g., *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). By contrast, plaintiffs' current effort to convert Matson's conduct into First Amendment expression is best exemplified by their highlighting (P. Mem. 3–4) this excerpt from Durkin Dep. Ex. 3, her statement at the July 6, 1983 meeting of the Human Rights Authority:

> I think one of the most truly disturbing [things] that came through in our investigation was that the Executive Director who is not a qualified professional, in even a related field of education, rehabilitation special education has demonstrated through his actions that he feels that he is more qualified than professionals to decide what is important and not important for handicapped students to learn. He has blatantly held himself up above the law and he has acted in total disregard of the regulations. He is running Grove School by his own philosophy according to his own rules and regulations in complete disregard of the law and this is just absolutely appalling.

That characterization of the Matson practices as a product of "his own philosophy" does not serve as a philosopher's stone, transmuting the base metal of conduct into the gold of "speech" for *Harlow* purposes. Surely plaintiffs have demonstrated noth-

ing in the context surrounding their conduct that (in *Azeez* terms) "put [defendants here, as] potential defendants [,] on notice that their conduct probably [was] unlawful." Plaintiffs have failed utterly to identify any "clearly established" standard that holds (or even suggests) that the pursuit of an investigation by a state body having that duty amounts to a First Amendment violation, simply because the effect (or even the purpose) of that investigation is to discredit the teaching method that has occasioned complaints and thus triggered the investigation.

Here defendants exercised their statutory right and duty [5] under Ill.Rev.Stat. ch. 91½, ¶ 715 to investigate complaints lodged against School. But even if defendants intended to use that power to force plaintiffs to follow traditional teaching methods, no relevant case law suggests such regulation of conduct amounts to a chilling of speech as a "clearly established" matter. Plaintiffs have tendered no preexisting authorities with similar, or even readily analogous, facts that would have put defendants on notice their conduct was unlawful.

It must then be concluded defendants did not violate any "clearly established ... constitutional rights" of plaintiffs in the free-speech area in the *Harlow-Benson-Azeez* (or any other) sense. They are therefore immune from damages for that claim.[6]

### Conclusion

There is no genuine issue of material fact, and all defendants are entitled to judgment as a matter of law, as to their immunity from damages for plaintiffs' Section 1983 claim. Because that claim was the only peg for federal jurisdiction, *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) counsels dismissal of plaintiffs' pendent state-law claims. Accordingly those

---

**5.** "Duty" is not used loosely here. When Board receives a complaint, the statute mandates Board "shall conduct an investigation unless it determines that the complaint is frivolous or

beyond the scope of its authority or competence."

**6.** That being so, it is unnecessary to reach defendants' other contentions.

claims are dismissed without prejudice. This entire action is therefore dismissed.