Susan **NITSCHNEIDER**, Michael Culat and Thomas Fisher, Plaintiffs,

v.

Charles H. **MILLER**, individually and as Chief of Police of the Antioch Police Department, Defendant.

No. 92 C 4360.

United States District Court, N.D. Illinois, E.D.

May 6, 1993.

---

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

In retaliation for their support of Mayor Robert Wilton, plaintiffs Susan Nitschneider ("Nitschneider"), Michael Culat ("Culat"), and Thomas Fisher ("Fisher") claim that defendant Charles Miller ("Miller"), Chief of Police of the Antioch Police Department, filed disciplinary charges against each of them. Alleging that their First Amendment rights to free speech and association were violated, plaintiffs brought suit against Miller, individually and in his official capacity, under 42 U.S.C. § 1983. Presently before us is Miller's motion for summary judgment. For the reasons set forth below, we grant the motion in part, and deny it in part.

### I. Factual Background

The events at issue here began in 1989, in the shadow of a hotly contested mayoral race in Antioch. Miller, the Chief of Police for Antioch, supported the incumbent, Raymond Toft, over the challenger, former mayor Robert Wilton. One of the issues in the election was whether Wilton, if elected, would reappoint Miller as Chief of Police. Although Culat, who was a patrolman in the Antioch Police Department ("Department") at the time of the election, and Nitschneider, a radio dispatcher, did not support Mayor Wilton's bid for office, Fisher, one of two lieutenants on the police force and a longtime friend of Wilton's, did endorse his candidacy.

In April, 1989, the voters chose Wilton to be mayor of Antioch. Several months later, in June, Wilton informed Miller that he would like his resignation. When Miller refused to resign, Wilton told Miller that he intended to remove him as Chief of Police.

Friction between Wilton and Miller eventually became public. In response to the

threat of Miller's removal, Antioch residents swarmed a Board of Trustees meeting, dubbing it the "Save Our Chief" meeting. Both Nitschneider and Miller attended, and during the course of the meeting, a number of citizens criticized two trustees for attacking Miller and the Department. In their defense, Nitschneider praised the two men as being the only trustees who had ever spoken to Department members during her tenure on the force.

At about the same time, Miller asked Culat, the officer in charge of evidence, to prepare a report detailing the whereabouts of all guns that had wended their way through the Department evidence locker since 1978. At the conclusion of his investigation, Culat prepared three lists tracking the disposition of the guns. Although there is some dispute as to the content of each list, the lists made clear that there were a number of guns for which no one could account.

After Culat submitted his findings to Miller, the Chief turned around and developed a report for Mayor Wilton. Miller's report purported to explain what had become of the unaccounted for weapons. In the wake of Miller's recital, Wilton met directly with Culat and asked him whether Miller's report matched Culat's. Culat replied that it did not, adding that he believed some of the missing guns had been given to officers in the Department.

Ultimately, Wilton and Culat, along with Fisher, presented the issue of the errant guns to the State's Attorney's office, which declined to investigate the matter. Subsequently, the State Police conducted an independent investigation, turning up no evidence of wrongdoing.

During this time, Culat worked under Wilton's direct supervision. For example, while on duty, Culat scoured area taverns for signs of Miller's car, logging the time spent as "investigation." In general, Culat reported directly to Wilton on matters pertaining to

Miller. Eventually, Miller grew to distrust Culat.[1]

In October, 1990, Miller gave Culat a two-day suspension for negligently losing a money order, failing to tag evidence, and for behavior unbecoming an officer. On appeal, the Board of Fire and Police Commissioners ("Board") reduced the suspension to a written reprimand on one of the charges.

In the fall of 1990, Department employees began reporting various troublesome incidents, such as damage to squad cars, mail tampering, and missing property. Fisher and Culat were among those reporting problems. In response to these reports, Miller secretly installed a security camera in the squad room. Other than Miller, only Lieutenant Charles Watkins knew about the hidden camera.

The tapes revealed various misdeeds and misdemeanors by Department employees. The camera, along with audiotapes of radio and phone conversations, recorded Officers Kay, Culat, Fisher and Walsh, along with radio operators Good, Linehart and Nitschneider looking through, opening, or making photocopies of Miller's mail, captured Sergeant Lange using vulgar language (language Miller deemed inappropriate), and recorded Culat and Nitschneider, who was married, but separated, at the time, embracing, kissing, and fondling.

In January, 1991, Miller filed a slew of charges against Fisher, Culat, and Nitschneider, seeking their termination. The charges essentially tracked the conduct contained in the tapes. Miller did not, however, file charges against Kay, Walsh, Good, Linehart, or Lange, although he later reprimanded Lange, Kay, and Linehart in writing.

In April, 1991, after a hearing, the Board found Culat guilty of all but one of the charges and ordered that he be discharged from the Department. In July, after a separate hearing, the Board held Nitschneider guilty of all but one of the charges and, likewise, fired her. The Board, however, did

---

1. In his deposition, Culat acknowledged that Miller had justification for not trusting him. Culat Dep. at 261.

not hold a hearing regarding Fisher. Instead, Fisher and Miller reached a settlement. Under its terms, Miller dismissed all charges against Fisher except that alleging that Fisher made a statement inimical to the Department's welfare. In exchange, Fisher pleaded guilty to the remaining charge and was suspended for three days without pay. Approximately one year later, Fisher resigned from the Department.

## II. Discussion

### A. Official Capacity Suit

■ Miller argues that plaintiffs' suit against him in his official capacity must be dismissed because he is not the final policymaker for municipal employment policy. Under § 1983, an official capacity suit is equivalent to a suit against the municipality itself. *Kentucky v. Graham*, 473 U.S. 159, 166–67 n. 14, 105 S.Ct. 3099, 3105–06 n. 14, 87 L.Ed.2d 114 (1985); *Yeksigian v. Nappi*, 900 F.2d 101, 103 (7th Cir.1990). Because liability will only lie against a municipality where the constitutional deprivation at issue derives from a municipal policy or custom, only an official with final policymaking authority can subject a municipality to § 1983 liability. In turn, the determination of whether a given official had final policymaking authority for the actions(s) at issue is a question of law. *Jett v. Dallas Independent School District*, 491 U.S. 701, 737, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989).

■ In Antioch, the Board of Trustees for the village adopted the Board of Fire and Police Commissioners Act ("Act"). The Act clearly sets forth the policy that police employees are not to be coerced into offering political support, either monetary or otherwise, nor are they to be retaliated against for failing to provide such support. Further-

more, under the Act, the Board wields strong and final authority in matters of police discharge. *See* Ill.Rev.Stat. ch. 24, ¶ 10–2.1–17; Rules and Regulations of the Board of Police Commissioners, Village of Antioch, §§ 9–12; *Stearns v. Board of Fire and Police Commrs.*, 59 Ill.App.3d 569, 16 Ill.Dec. 770, 375 N.E.2d 877 (1978). An officer can only be discharged for cause, and the right to determine what constitutes "cause" is vested with the Board. Rules and Regulations at § 1(d). The Board holds hearings on those officers facing charges and, if it makes a finding of guilty, may remove, discharge, or suspend an officer. Furthermore, upon appeal by a disciplined officer, the Board reviews the Chief's decisions and may either sustain or reverse his actions. While the Chief may act on his own to suspend an officer, he is limited to imposing suspensions of five days or less, and an officer may appeal his suspension to the Board. Rules and Regulations at § 8(b) & (c); Ill.Rev.Stat. ch. 24, ¶ 10–2.1–17. Moreover, as events in this case demonstrate, the Board does not merely rubber stamp the Chief's actions. When Culat appealed his suspension, the Board reduced the discipline to a written reprimand. We must conclude, therefore, that Chief Miller is not the final policymaker regarding employee discipline and discharge, nor does he shape the employment policy for the Department, as evidenced by the Rules and Regulations prohibiting the use of political criteria in employment decisions. Accordingly, we dismiss the official capacity suit.[2] *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986) (A municipality cannot be held liable for an official's activity, unless that official is "responsible for establishing final government policy respecting such activity"). Any liability for Miller's actions belongs solely at Miller's doorstep.[3]

---

**2.** It is not clear whether Board policy applied to radio dispatchers like Nitschneider. The fact that the Board conducted a hearing regarding her alleged infractions is compelling evidence that, just as with Fisher and Culat, the Board is the body with final authority over dispatcher discharges. However, even if it is not, an official capacity suit still will not lie on Nitschneider's claim, since the Village of Antioch enacted legis-

lation vesting authority over municipal employment policy with its Board of Trustees.

**3.** We note that plaintiffs have not argued, nor have they presented evidence suggesting, that the Board's decisions regarding Nitschneider, Fisher, and Culat were tainted by political considerations. Thus, the Board's conduct does not provide a basis for municipal liability.

## B.  Qualified Immunity[4]

■ Next, Miller contends that he is entitled to qualified immunity from any damages relating to the disciplinary actions taken against the plaintiffs.  Qualified immunity serves to shield officials performing discretionary functions from individual liability, unless their decisions violate clearly established constitutional or statutory rights.[5]  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).  Courts must determine, therefore, whether the right at issue was clearly established at the time, given the facts before the official.[6]  *Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir.1988) (en banc), *cert. denied*, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988).

Under current law, a person's political beliefs and affiliation may be considered where political loyalty is an appropriate job requirement *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).  The question, then, is whether there was genuine confusion about whether political affiliation was an appropriate job qualification for (1) police lieutenants, (2) investigators, or (3) radio dispatchers.

### 1.  Lieutenants

■ Miller's arguments that this area of the law is unsettled apply most strongly in the case of Lieutenant Fisher.  First, the parties have not pointed to, nor has this Court found, any case which expressly holds that a police lieutenant cannot be fired based on his political affiliation.  At the same time, case law makes clear that public employers may make politically-motivated firing decisions when the employee at issue holds a position which "authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation."  *Tomczak v. Chicago*, 765 F.2d 633, 641 (7th Cir.1985), *cert. denied*, 474 U.S. 946, 106 S.Ct. 313, 88 L.Ed.2d 289 (1985).  While the exact meaning and application of this standard is far from clear, this

---

**4.**  Although Miller denies having sought termination of the plaintiffs for political reasons, for the purposes of this section, we will assume that the Chief filed charges against the plaintiffs in retaliation for their political affiliations or actions.

**5.**  The fact that Miller's actions may have violated municipal regulations does not bear on Miller's qualified immunity.  Because the plaintiffs' § 1983 claims do not derive from any violation of the local regulation prohibiting hiring based on political contributions, any such violation would not limit damages stemming from an alleged constitutional violation.  *See Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) (Court stated that "if a statute or regulation does give rise to a cause of action for damages, clear violation of the statute or regulation forfeits immunity only with respect to damages caused by that violation."); *Coleman v. Frantz*, 754 F.2d 719 (7th Cir.1985) ("Defendant sheriff's alleged violation of Indiana law does not bar his ability to claim a qualified immunity under *Davis v. Scherer*," because the constitution, rather than the allegedly violated law, formed the basis for the § 1983 claim.).

*Upton* does not alter this rule.  In a footnote, the *Upton* court indicated that "[p]resent-day realities are that some deputy sheriffs are protected by some form of civil service laws and regulations which ... prevent political ... termination.  While exceptions to the trend may keep this issue alive, the continuing close divisions in the courts emphasize that statutes and contracts are a much more viable method of job protection than reliance on blurry constitutional lines drawn by the courts."  *Upton*, 930 F.2d at 1216 n. 4.  The court later noted that in addition to the signals from *Branti*, *Tomczak*, and *Livas*, the removal of civil service protections from deputy sheriffs might have signalled the sheriff that deputies "had no statutory or contractual rights and could legally be discharged."  *Id.* 930 F.2d at 1217 n. 5.  In the absence of any express discussion of the issue, however, we do not read *Upton* to overturn *Davis v. Scherer* and *Coleman*.  Rather, *Upton* appears to suggest that plaintiffs would be wise to take advantage of civil service regulations, where they exist, rather than gambling that courts will find a clearly established constitutional right on which to base a § 1983 claim.

**6.**  A review of Seventh Circuit jurisprudence in this area reveals that in order for a right to be "clearly settled," a direct case on point, or at least a factually analogous case, must exist.  *See, e.g., Kompare v. Stein*, 801 F.2d 883, 887 (7th Cir.1986) ("Closely analogous cases, decided before the defendant acted or failed to act, are often required to find that a constitutional or statutory right is clearly established."); *Azeez v. Fairman*, 795 F.2d 1296, 1301 (7th Cir.1986) (In order to avoid eviscerating the defense of qualified immunity, court held that the right at issue "must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful").  Moreover, whether a right is clearly established is a question of law for the court.  *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir.1988).

circuit has generally considered whether the job involved a high level of responsibility and whether the position enabled its holder to threaten the goals of the political party in power. *See, e.g., Selch v. Letts,* 792 F.Supp. 1502 (S.D.Ind.1992).

In Antioch, after the police chief, the lieutenant is next in command. The Department contained two lieutenants who split the responsibilities of the job. As described by the parties, the lieutenants had a great deal of authority. Between the two, they scheduled and supervised patrols, conducted investigations, and generally ran the office.[7] Given the absence of direct case law and the high level of responsibility involved in the lieutenant's job, it was unclear at the time Miller filed charges against Fisher whether political affiliation was an appropriate job qualification for the position.[8] *See Upton v. Thompson,* 930 F.2d 1209 (7th Cir.1991) (court held that not only was it unclear in 1986 whether or not the political firing of a deputy sheriff violated the First Amendment, but in 1991, political considerations were appropriate given the autonomy and discretion they possessed). Accordingly, we find that Miller is protected by qualified immunity with respect to Fisher's claim and grant summary judgment on this portion of the complaint.

### 2. Radio Dispatcher Nitschneider

■ If Miller's argument for qualified immunity is strongest in Fisher's case, it is the weakest in Nitschneider's. As opposed to Fisher, who was second in command, Nitschneider was a radio dispatcher for the Department. Miller argues that the head of a public department must legitimately concern himself with the public's perception of his department's competence, lest he face defeat at the polls or removal from office. He goes on to maintain that, as the Department's direct link to the public, a radio dispatcher can play a critical role in shaping public perception of the Department's competence.

While this may be true, there is no question that low level public employees are immune from the patronage system. Equally clear, is that a radio dispatcher, who exercises little meaningful discretion and has no authority over Department policy, is not the sort of employee who can be required to meet a political litmus test. Miller, therefore, is not entitled to qualified·immunity with respect to Nitschneider's claim.

### 3. Investigator Culat

Investigator Culat poses a more difficult question than either Fisher or Nitschneider. Falling between the two on the spectrum of autonomy and discretion, it is more difficult to assess whether political affiliation is an appropriate job qualification, or, more to the point, whether political termination of an investigator violates a clearly established constitutional right. Fortunately, we need not address this issue, for we must grant summary judgment on Culat's claim on other grounds, as discussed in the following section.

### C. Efficient Work Environment

■ A public employee does not lose his or her constitutional rights when she takes a job with the government. However, a public employee's First Amendment rights must be balanced against the governmental employer's need to efficiently and effectively provide services to the public. *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Churchill v. Waters,* 977 F.2d 1114, 1123 (7th Cir.1992). Whether an employee's First Amendment rights outweigh his employer's interest in harmony is a question of law. *Id.* 461 U.S. at 146–150, 103 S.Ct. at 1690–1692; *Breuer v. Hart,* 909 F.2d 1035

---

7. During the relevant time, Fisher was in charge of the night patrol, while Watkins oversaw the day patrol. In determining whether a position merits patronage, courts look to "the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office." *Tomczak,* 765 F.2d at 640. Even if Fisher carried out less critical duties, therefore, he may still not be insulated from political considerations. *Id.* at 641 ("Thus, if an officeholder performs fewer or less important functions than usually attend his position, he may still be ex-

empt from the prohibition against political terminations if his position inherently encompasses tasks that render his political affiliation an appropriate prerequisite for effective performance.").

8. Moreover, any clarity would most likely have cut in Miller's favor—that is, that political loyalty was an appropriate job prerequisite for a lieutenant in the Department.

(7th Cir.1990) ("Though these inquiries require predicate factual determinations, they are questions of law.").

■ Miller contends that even if Culat's activities were protected, a matter he disputes, the investigator's conduct disrupted the Department's operation, and Miller's interest in restoring order outweighed Culat's expressive rights. In balancing the parties' interests, courts look to a variety of factors:

> (1) the need to maintain discipline or harmony among co-workers; (2) the need for confidentiality; (3) the need to curtail conduct which impedes the [employee's] proper and competent performance of his daily duties; and (4) the need to encourage a close and personal relationship between the employee and his superiors, where that relationship calls for loyalty and confidence.

*Breuer*, 909 F.2d at 1040, quoting *Clark v. Holmes*, 474 F.2d 928, 931 (7th Cir.1972) (*per curiam* ), *cert. denied*, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973). Both the Supreme Court and the Seventh Circuit have emphasized the importance of the fourth element, declaring that "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick*, 461 U.S. at 151–52, 103 S.Ct. at 1692–93. The Seventh Circuit has further specified that "there is a particularly urgent need for close teamwork among those involved in the 'high stakes' field of law enforcement." *Breuer*, 909 F.2d at 1041.

It is undisputed that Culat's "political" activities included requesting the State's Attorney's office to investigate Miller in connection with missing evidence and looking for Miller's car at area taverns while on duty, at Wilton's behest and unknown to Miller.[9] Miller claims that this behavior undermined his confidence in Culat's loyalty and performance, and, when asked, Culat conceded that Miller had justification for not trusting him.

There can be no question that a police chief must be able to trust his officers to carry out orders and work to fulfill the obli-

gations of the department. Once assigned to an investigation or project, investigators operate autonomously, with little direct supervision. Here, Culat's loyalty was to Wilton, not Miller, and Miller knew it.[10] Although Miller presents no evidence that Culat failed to follow instructions, Miller does contend that Culat became a rogue officer—answering to Wilton, rather than Miller, conducting side investigations without Miller's knowledge or approval, and instigating an investigation of Miller by the State's Attorney. Culat does not deny any of these activities, even conceding that Miller's mistrust of him was justified. Culat Dep. at 261. Under these circumstances, Miller and Culat did not have the trust and rapport to work effectively together. Furthermore, there is evidence that Culat's work itself was being affected. Rather than dedicating his time to Department business, he was spending some of his on-duty hours investigating Miller. *See Breuer*, 909 F.2d at 1041 ("Had Breuer conducted his investigation [of the police chief] on his own time, without involving other members of the Department, he might credibly argue that these activities did not interfere with his work or the work of others."). Even viewing Culat's behavior in the light most favorable to him—that he was working for the mayor of his village trying to uncover and expose a corrupt police chief—we must conclude that his conduct was disruptive.

We do not wish to minimize the importance of "whistleblowers." Often, the willingness of an employee to speak out against his or her employer is all that stands in the way of corruption. At the same time, this circuit has consistently recognized the importance of teamwork and *esprit de corps* among police officers, and the need for order and discipline throughout a police department. *See Egger v. Phillips*, 710 F.2d 292, 319 (7th Cir.1983) ("Mutual trust and respect among agents and between agents and supervisory personnel are particularly important in law enforcement."); *Breuer*, 909 F.2d at 1041 ("Speech that might not interfere with work in an environment less dependent on order, discipline, and *esprit do corps* could be debili-

---

9. Miller cites additional activities, but in light of questions of material fact, we will not include them in our analysis here.

10. Culat admitted that if he was involved in a matter affecting Miller, he would discuss it with Wilton, rather than Miller. Culat Dep. at 103.

tating to a police force."). Although Culat's efforts may have been well-intentioned, they jeopardized the cohesion and chain of command within the Department, and were "reasonably calculated to create disharmony or to have impaired discipline." *Yoggerst v. Stewart,* 623 F.2d 35, 40 (7th Cir.1980). We may commend his intent, but by working as a mole, Culat undercut his ability to contribute to the Department's public responsibilities, and Miller's ability to fulfill his public obligations. Therefore, we grant summary judgment in favor of Miller with respect to Culat's claims.

### D. Nitschneider's Discharge

The sole remaining charge, then, stems from Nitschneider's termination. Miller requests summary judgment on this claim, arguing (1) that Nitschneider offers insufficient evidence that her political expression motivated Miller's decision to file disciplinary charges, and (2) that she would have been fired anyway. Miller's first argument must fail, as there is a genuine issue of material fact regarding Miller's motivations. Nitschneider avers that Lieutenant Watkins commented that she was on the wrong political side and should watch herself. Additionally, Nitschneider offers evidence that Miller elected not to file charges against other Department employees caught committing similar violations. Finally, at least one trustee heard Trustee Cunningham remark that had Nitschneider not gotten involved, she would not have been in her position.[11] Miller's innocent explanations of these statements do not eliminate them, nor does the gap between Nitschneider's statement and Miller's decision to file charges eradicate any issue regarding his motivation. A reasonable trier of fact could find, based on the evidence, that Nitschneider's public support of Miller's detractors prompted his actions against her.

Miller's second argument—that Nitschneider would have been fired anyway—carries more force, at least on its face. Miller argues that the videotapes of Nitschneider kissing Culat and removing mail from Watkins' box, along with the Board's eventual decision to terminate Nitschneider, conclusively demonstrate that the dispatcher would have been fired anyway. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 242, 109 S.Ct. 1775, 1786, 104 L.Ed.2d 268 (1989); *Matlock v. Barnes,* 932 F.2d 658, 665 (7th Cir.1991) ("A public employer can escape liability for what seems to be a politically motivated employment decision by showing that it would have reached the same employment decision even in the absence of the protected conduct."). Miller's arguments, however, miss the point. Under the *Price Waterhouse* analysis, Miller must show that *his own* decision to file charges against Nitschneider would have been the same, regardless of political motivations. Instead, Miller contends that the Board would have fired Nitschneider anyway. Because Nitschneider does not claim that the Board's decisionmaking was tainted by patronage concerns, this inquiry is irrelevant to Miller's liability.

Miller might be trying to argue that his actions did not cause Nitschneider's dismissal, and, consequently, her damages. The fact is, however, if Miller had not filed charges against Nitschneider, the Board would not have held a hearing or have ordered her discharge. Moreover, there is evidence suggesting that Miller did not file charges against other employees caught on the videotape violating Department rules or procedures. Because Miller could have exercised his discretion differently, as he did in the cases of Lange, Kay, and Linehart, his decision constitutes a cause in fact of Nitschneider's damages. Additionally, because the Board's action was foreseeable, Miller's decision proximately caused her discharge, and any resultant damages. In light of the fact issues surrounding the degree to which politics motivated Miller's decision, we deny his motion for summary judgment with respect to Nitschneider's claims.

### III. Conclusion

For the foregoing reasons, we grant in part and deny in part Miller's motion for summary judgment. It is so ordered.

---

11. In his deposition, Cunningham denied making such a statement. However, Board member Larry Hanson testified in his deposition that he heard Cunningham remark that if Nitschneider had not gotten involved, she would not be in her position. Hanson Dep. at 40.