Jacqueline ABEL, et al.,
Plaintiffs-Appellees,
Cross-Appellants,

v.

Harold MILLER, et al.,
Defendants-Appellants,
Cross-Appellees.

Nos. 85–2272, 85–2342 and 85–2683.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 9, 1986.

Decided July 21, 1987.

**1524**

Martin C. Carlson, U.S. Dept. of Justice, Washington, D.C., for defendants-appellants, cross-appellees.

Jan Susler, Peoples Law Office, Chicago, Ill., for plaintiffs-appellees, cross-appellants.

Before EASTERBROOK and RIPPLE, Circuit Judges, and GRANT, Senior District Judge.*

RIPPLE, Circuit Judge.

In late 1980, after a series of inmate disturbances at the United States Penitentiary at Marion, Illinois (Marion), the Marion Prisoners' Rights Project (MPRP or Project) and four members of its staff—three attorneys and one paralegal—were banned from access to the prison and their inmate-clients. The MPRP, the individual attorneys and paralegal, and three Marion inmates brought an action for injunctive and monetary relief against three Marion administrators, claiming that the bans violated their constitutional rights. The jury found in favor of the attorneys and paralegal against the prison officials and in favor of the prison officials on the claims of the MPRP and the inmates.

The defendant prison officials appeal the judgments in favor of the attorney and paralegal plaintiffs. They contend that, as prison officials, they were entitled to qualified immunity and that the district court erred by denying their motion for a directed verdict on that basis. The MPRP and the inmate plaintiffs cross-appeal the judgments in favor of the defendant prison officials. They argue that the district court erred in denying their motion for judgment notwithstanding the verdict (judgment n.o.v.).[1]

For the reasons set forth in this opinion, we affirm the judgment of the district court insofar as it finds the defendant prison officials not liable to the prisoners[2] and the MPRP.[3] In all other respects, we vacate the judgment of the district court and remand the case for proceedings consistent with this opinion.

I

Introduction

A. *Facts*

1. Parties

Defendants-appellants are individuals who, in the fall of 1980, were administrators of the United States Penitentiary in Marion, Illinois.[4] Harold Miller was the

---

* The Honorable Robert A. Grant, Senior District Judge, Northern District of Indiana, is sitting by designation.

1. The plaintiffs also cross-appeal the district court's denial of their request for certification of a class of inmate plaintiffs whose constitutional rights were allegedly infringed. In addition, they claim that the district court erred in refusing to expunge the prison disciplinary records of two of the inmate plaintiffs. The plaintiffs further cross-appeal the district court's refusal to instruct the jury that it could consider punitive damages against the defendants. They also cross-appeal the court's denial of their motion for sanctions against the defendants.

2. *See* notes 1, 13.

3. *See infra* note 15.

4. The United States Penitentiary at Marion, Illinois (Marion) is classified by the Bureau of Prisons as a level 6 institution. Marion is the highest level security prison in the United States. Most of the inmates at Marion have been convicted of violent crimes. Many have been transferred to Marion from other prisons to protect prisoners in the transferring institutions.

warden at Marion; John Clark was the associate warden; and Richard Phillips was the executive assistant to the warden.

Plaintiffs-appellees are three attorneys, Jacqueline Abel, Martha Easter-Wells and James Roberts, and a paralegal, Janet Mitchell Hinton. Plaintiffs-cross-appellants are the MPRP and three Marion inmates, Leonard Peltier, Tyrone Thomas-Bey and Sundiata Acoli (a/k/a Clark Squire). Appellees Ms. Abel, Ms. Easter-Wells, Mr. Roberts and Ms. Mitchell were employed by the MPRP. Cross-appellants, Mr. Peltier, Mr. Thomas-Bey and Mr. Acoli were clients of the MPRP, and inmate-members or alternate members of the MPRP board of directors.

## 2. The MPRP

The MPRP is an Illinois not-for-profit corporation whose purpose is to provide attorneys to assist Marion prisoners with legal problems and to educate the public about the conditions at the prison. It was founded in mid-1979. The Project's goal was the "immediate humane treatment of all prisoners, but ultimately it sought to eliminate Marion and other prisons where isolation, brutality and arbitrary treatment are regularly used." Appellees' Br. at 1–2. Beginning in the fall of 1979, MPRP employees made regular visits to Marion to meet with inmates. The visits were made both to discuss legal matters and to conduct board meetings with the MPRP's inmate-directors. These regular visits continued until mid-October of 1980.

## 3. Marion Work Strikes

Marion experienced three work strikes during 1980. The first of these occurred in January, the second in March, and the third in September. MPRP employees continued to meet with inmates during the January and March work strikes and during the third work strike until October 15. The MPRP also "continued [its] community education work, which involved responding to inquiries from various media about the

work stoppage inside Marion ..., [and] describing the tension and frustration the prisoners felt at the [prison officials'] lack of responsiveness to their just grievances." *Id.* at 8. MPRP staff publicly criticized the prison administrators for their treatment of the prisoners.

## 4. The October 1980 Ban

During the third work-strike, in mid-October 1980, without prior notice, MPRP attorneys, Ms. Abel and Ms. Easter-Wells, and an MPRP paralegal, Janet Mitchell, were barred by the prison administrators from entering Marion to meet with inmates for the duration of the work strike. Ms. Abel, Ms. Easter-Wells and Ms. Mitchell were permitted to communicate confidentially by telephone or by mail with Marion inmates. Other MPRP employees were allowed access to the prison.

Marion officials claim to have barred Ms. Abel and Ms. Easter-Wells from access to the prison because the attorneys had encouraged Mr. Thomas-Bey, an inmate, to violate prison rules by assisting him to prepare strike demands during the third 1980 work strike.[5] Warden Miller consulted with his Bureau of Prisons superior, the United States Attorney, and Regional Counsel for the Bureau of Prisons before limiting the MPRP employees' access to Marion.

Warden Miller stated in a letter to the MPRP that he had barred Ms. Mitchell from the prison because of public statements made by the paralegal which "repeated, amplified, ratified or condoned the strike." Plaintiffs' Ex. 6 R.1 at Ex. A. Prison officials stated that they believed "that Mitchell had used her visitation privileges to obtain inflammatory information regarding the progress of the work strike," Appellants' Br. at 16; Tr. at 380, 1429–31, and that they "feared that her remarks had dangerously heightened tensions within the prison." Appellants' Br. at 16; *see* Tr. at 1429–30.

---

5. Ms. Abel and Ms. Easter-Wells admitted to having loaned Mr. Thomas-Bey the paper on which he wrote the strike demands. The demands were written during a meeting between Ms. Abel, Ms. Easter-Wells and Mr. Thomas-Bey.

The prison officials claimed that Ms. Abel and Ms. Easter-Wells admitted to acting as a "sounding board" for Mr. Thomas-Bey during that meeting.

### 5. The December 1980 Ban

In late December 1980, the district court denied MPRP employees Ms. Abel, Ms. Mitchell and Ms. Easter-Wells a preliminary injunction against the October ban. Upon denial of the preliminary injunction, Marion officials extended the ban on access to the prison to all Project employees. Communication between Project employees and Marion inmates was limited to unsealed letters and monitored telephone calls. The duration of the ban was extended indefinitely. MPRP attorney, Mr. Roberts, was allowed, as part of his private, non-Project, practice to have access to Marion and to maintain confidential mail privileges. Marion officials justified the increased restrictions on the basis of information they had received suggesting that the Project encouraged prison disruptions. An inmate, Jack Abbot, discussed the activities of the MPRP at Marion with Associate Warden Clark. Mr. Abbot told Mr. Clark that Project employees actively encouraged inmates to strike and smuggled contraband into the prison. Mr. Abbot later executed a sworn statement alleging that MPRP employees encouraged Marion inmates to strike and to make false statements in lawsuits. Another Marion inmate, Leonard Huntsman, provided additional information. At about the same time that the prison officials received this information from Mr. Abbot and Mr. Huntsman, they learned that inmates served on the MPRP board of directors and that Project business was carried on during attorney-inmate meetings. Prison officials viewed the operation of a business by inmates and the use of attorney-client visits for purposes unrelated to litigation as infractions of prison regulations. These infractions were seen as particularly serious in light of the prison unrest then occurring.

### B. *History of the Litigation*

#### 1. Initial District Court Proceeding

On October 22, 1980, immediately after the imposition of the first ban against MPRP staff, Ms. Abel, Ms. Easter-Wells, Ms. Mitchell and the MPRP filed suit in the United States District Court for the Southern District of Illinois. They alleged violations of 1) their first amendment right to free speech, 2) "their [fifth amendment] right to pursue their occupations as attorneys and paralegal assistant," R.1 at 4, and 3) "their [sixth amendment] right of access to incarcerated clients," R.1 at 5. They requested monetary damages, attorneys' fees and preliminary and permanent injunctive relief. The plaintiffs subsequently filed an amended complaint, R.4, adding two inmate plaintiffs, Mr. Peltier and Mr. Thomas-Bey, and adding a claim that the inmate plaintiffs and those similarly situated were denied "their right of access to the courts and counsel of their choice in violation of the Sixth Amendment...." R.4 at 5.

The district court denied the plaintiff's request for preliminary injunctive relief. The court stated that the plaintiffs had failed to demonstrate a likelihood of success on the merits, especially because of the security concerns at Marion. The court noted that, at that time, other attorneys from the MPRP were allowed access to the prison. The district court concluded: "The action of the Warden here in refusing to allow plaintiffs Easter-Wells, Abel and Mitchell to visit inmates during the work stoppage is reasonable in light of evidence warranting [a] conclusion by prison authorities that the plaintiffs seek to instigate and prolong the inmate strike. The prison officials have reacted in good faith to what they perceive to be an emergency and judicial interference is not warranted at this time." *Abel v. Carlson*, Civ. No. 80–4493, order at 6 (S.D.Ill. Dec. 22, 1980); R.5 at 6.[6]

#### 2. First Appeal

On the same day that the preliminary injunction was denied, the Marion administrators expanded the ban to include all Project staff and extended it to an indefi-

---

**6.** The district court found as a fact that "[o]n numerous occasions, plaintiffs, particularly Ms. Mitchell, have supplied local news media with comments regarding Marion prison administration and the strike. These comments are viewed by prison officials as inflammatory and calculated to support the work strike within the facility." *Abel v. Carlson*, Civ. No. 80–4493, order at 2 (S.D.Ill.Dec. 22, 1980); R.5 at 2.

nite duration. The plaintiffs appealed the district court's denial of their motion for a preliminary injunction and filed an emergency motion for an injunction pending appeal. This court responded by temporarily enjoining Warden Miller from enforcing the October and December 1980 bans against MPRP attorneys with respect to their clients of record in six pending litigation matters.

In assessing the plaintiffs' probability of success on the merits, this court evaluated only the claimed rights of the inmates to legal representation and access to the courts.[7] The court reviewed the asserted bases for the bans to determine whether the bans were reasonable in the interests of institutional security. It concluded that the factual bases for those bans were insufficient. As to the October ban, this court held that the administrators should have given Ms. Abel, Ms. Easter-Wells and Ms. Mitchell advance warning that their actions would be viewed as threats to institutional security. The court also found the basis for the December 1980 ban unreasonable. The district court's order denying the plaintiffs' request for a preliminary injunction was therefore reversed and the Marion administrators were enjoined from enforcing the October and December 1980 bans. The action was remanded to the district court with leave to alter or vacate the injunction if and to the extent that the district court found, after further proceedings, that the bans were reasonable and justified in the interests of prison security.

3. District Court Proceedings on Remand

a. *The Trial*

In December 1982, the plaintiffs filed a "New Second Amended Complaint" adding as plaintiffs James Roberts and Sundiata Acoli. The complaint alleged violations of the plaintiffs' first, fifth, sixth and ninth amendment rights. In October 1983, the defendants filed a motion for summary judgment, raising a defense of qualified immunity. The district court denied this motion orally at a hearing held in November 1983. It stated that the qualified immunity defense presented questions of fact for the jury as to the reasonableness of the prison officials' actions in light of security concerns.

A jury trial was held beginning November 26, 1984. The defendants moved for a directed verdict at the close of the plaintiffs' evidence. Again they argued that they were entitled to qualified immunity as a matter of law. The district court, contrary to its determination when considering the motion for summary judgment that the qualified immunity defense presented questions of fact for the jury, denied the defendants' motion and held that "the good faith immunity does not apply." Tr. at 1602.

Both parties moved for directed verdicts at the close of all the evidence. On the issue of qualified immunity, the district judge stated: "I have thrown it out." *Id.* at 1645. "I think there is a clearly established right ... [w]ith respect to all of the claims." *Id.* at 1646. The court then ruled that the rights alleged in the complaint existed in December 1980 when Warden Miller acted.

The jury returned verdicts in favor of the attorney and paralegal plaintiffs against the prison official defendants. It also returned verdicts in favor of the prison official defendants against the prisoner plaintiffs and the MPRP. The prevailing plaintiffs were awarded damages in the following amounts: James Roberts—$15,000; Jacqueline Abel—$7,000; Martha Easter-Wells—$7,000; and Janet Mitchell—$7,000.

b. *The Motions for Judgment N.O.V.*

i. Defendant Prison Officials

Both parties filed motions for judgment n.o.v., amendment of judgment or a new trial. The defendant prison officials contended that they were entitled to a directed verdict on the qualified immunity defense and that the jury's verdict was inconsistent, unsupported by the evidence and excessive. Defendants' motion was denied in

---

7. This court stated: "We do not find it necessary for present purposes to analyze the asserted rights of the attorneys." *Abel v. Miller,* No. 80–2848, order at 4 (7th Cir. May 18, 1982) [681 F.2d 821 (table)].

its entirety. The district court held that the Marion officials were not entitled to a defense of qualified immunity because, as to the prisoners, the law was clearly established that prisoners have a right to have access to counsel and to the courts. The court expressed its belief that the jury instruction on the prisoners' sixth amendment right adequately stated the law. The court did not decide whether attorneys and paralegals have a constitutional right to carry out their profession free from undue government interference. The court summarily stated that "we find that the instructions given states [sic] the law and the evidence adduced at trial supports the verdict." *Abel v. Miller*, No. 82–5280, order at 7 (S.D.Ill. June 19, 1985); R.51 at 7. On this point, then, the court implicitly rejected the qualified immunity defense. The court also held that the first amendment right to speak out freely and to criticize official conduct without fear of retaliation was clearly established at the time of the 1980 bans and, consequently, that qualified immunity was not available to the defendants on that claim. "The jury could well have found, from the evidence before it, that the ban against the attorneys and the para-legal was in retaliation for the criticism in the media by the plaintiffs of prison conditions. If the jury found harassment by the prison officials for exercising constitutional rights, then their unjustified actions would make the officials liable." *Id.* at 8.

Rejecting the defendants' arguments that the verdicts were excessive, the court wrote: "It is the law in this and several other circuits that substantial damages may be awarded for the violation of substantive constitutional rights, even in the absence of 'evidence of consequential injury....'" *Id.* at 11 (citing *Owen v. Lash*, 682 F.2d 648 (7th Cir.1982); *Konczak v. Tyrrell*, 603 F.2d 13 (7th Cir.1979), *cert. denied*, 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980)). The court concluded

that the jury's award was fair, reasonable and supported by the evidence.

### ii. Plaintiffs

The plaintiffs contended that: 1) the May 18, 1982 opinion of the Seventh Circuit required that all plaintiffs be given a verdict; 2) the district court erred in denying class certification for the prisoner plaintiffs; 3) the court erred in refusing to submit their tendered instruction on punitive damages; 4) the court erred in refusing to permit the inmate plaintiffs to be present throughout the trial and in the use of "exaggerated" security measures; and 5) the evidence was sufficient to support a verdict in favor of the Project, Mr. Peltier, Mr. Acoli and Mr. Thomas-Bey. The plaintiffs' motion also was denied in its entirety. The district court rejected the plaintiffs' first argument based on this court's May 18, 1982 opinion. It cited *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255 (7th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982), in which this court held that rulings on preliminary injunctions do not bind the court in a subsequent trial on the merits. As to the asserted error in denying class certification, the court noted that it had found that the plaintiffs failed to meet their burden for certification of a class of prisoner plaintiffs. The district court also rejected the plaintiffs' sufficiency of the evidence challenge noting that the evidence supported the jury verdict as rendered. The court found that the plaintiffs' other contentions were without merit.[8]

This appeal follows the district court's denial of the cross-motions for judgment n.o.v. or for a new trial.

## II

### Discussion

This is a difficult case. It is not the legal issues that make it difficult. Rather, our burden is caused by the state of the record.

---

8. The plaintiffs also filed a post-trial motion for injunctive relief requesting, *inter alia,* a permanent injunction against the bans and against any other interference with plaintiffs' attorney-client relationships at Marion. The district court granted the plaintiffs' request, ordering that the

May 1982 Seventh Circuit order enjoining the October and December 1980 bans was to remain in effect. *Abel v. Miller*, No. 82–5280, order at 2 (S.D.Ill. Sept. 5, 1985). This injunction is not an issue on appeal.

To put it mildly, the trial proceedings lacked focus. We have had to wade through convoluted judicial proceedings to determine the precise nature of the plaintiffs' allegations, the tenor of the defenses raised by the defendants, and the basis for the trial judge's rulings. All participants in the trial bear some responsibility for the disheveled state of the record. To avoid further confusion, we shall set forth at length the results of our time-consuming reconstruction of the trial we have been asked to review.

A. *Constitutional Rights Asserted*

In the plaintiffs' complaint, entitled "New Second Amended Complaint," filed after the appeal of the district court's denial of the preliminary injunction was decided by this court, the plaintiffs claimed that the actions of the defendants destroyed the work of the MPRP and therefore violated the first, fifth, sixth and ninth amendment rights of Ms. Abel, Ms. Easter-Wells, Mr. Roberts, Ms. Mitchell and the MPRP. The plaintiffs alleged that the defendants, "acting in concert on the basis of fabricated allegations of purported violation of institutional rules which they knew were baseless and false, imposed a ban, ... upon visits by [Ms. Easter-Wells], [Ms.] Abel or [Ms.] Mitchell, ... to their clients or any other prisoners at [Marion]." R.16 at 3, ¶ 8. They claimed that

> [t]he ban against MPRP and its employees was imposed by defendants in knowing bad faith, in a purposeful attempt to destroy the work and legitimacy of the Project by preventing access to prisoners at Marion and interrupting the legal work—much of which involved actions against the Marion administration for alleged constitutional violations—being carried on by the lawyers in the prisoners' behalf.

*Id.* at 5, ¶ 15. The plaintiffs also claimed that the defendants used false, incriminating information against the MPRP plaintiffs to support the December 1980 ban. *Id.* at 5–6, ¶ 17.

The plaintiffs further asserted that the actions of the defendants in punishing the prisoner plaintiffs through disciplinary proceedings and by various forms of depriva-tion and harassment for their participation on the MPRP board of directors violated the prisoner plaintiffs' rights under the first, fifth, sixth and ninth amendments. Finally, the complaint claimed that the defendants' actions deprived the prisoner plaintiffs of their right to legal assistance from the MPRP, including the right to counsel and the right to access to the courts, in violation of the prisoner plaintiffs' first, fifth, sixth and ninth amendment rights.

While the claims are stated somewhat inartfully, we can conclude from a generous reading of this "New Second Amended Complaint," and the allegations therein, that the plaintiffs have asserted the following rights:

1) The MPRP's and its employees' first amendment right to free speech through speaking out publicly and pursuing litigation (including a right of access to the prison);

2) The MPRP's and its employees' right to be free from retaliation for the exercise of their first amendment rights;

3) The MPRP employees' due process right to practice their profession without undue governmental interference (including a right of access to the prison);

4) The MPRP's due process right to carry out its purpose without undue governmental interference;

5) The Marion prisoner plaintiffs' first amendment right of association through membership on the MPRP board of directors;

6) The prisoner plaintiffs' right to be free from retaliation for exercising their first amendment rights; and

7) The prisoner plaintiffs' due process right to access to counsel and to the courts.

The plaintiffs' answer to the defendants' motion for summary judgment (asserting the qualified immunity defense) supports our reading of the constitutional claims asserted in the "New Second Amended Complaint." The plaintiffs therein describe the rights at issue as: "the right of prisoners to have lawyers and access to the Courts, the right of lawyers to see and serve their

clients, and the right of both to criticize the prison administration, as a matter of free speech...." R.24 at 2. The plaintiffs, later in the same pleading, state that the "[p]laintiffs had a right to criticize the prison, that the lawyers had a right to go in and visit clients and litigate for them against the prison—and to (try to) make their living that way—and that the prisoners had a right to have lawyers who would help them legally seek redress for wrongdoing against them inside, and to seek change." *Id.* at 10.[9]

## B. *The Qualified Immunity Defense*

After the plaintiffs filed their "New Second Amended Complaint," the defendants filed a motion for summary judgment in which they raised the defense of qualified immunity. The defendants argued that their actions did not "violate any clearly recognized constitutional or statutory right of the plaintiffs." R.22 at 26, ¶ 16. Moreover, they argued that the restrictions on access "were consistent with the existing case law, which recognized preservation of institutional security as the central goal of prison administration." *Id.* at 27, ¶ 17.

A review of the claims asserted by the plaintiffs and of the pleadings and hearing related to the motion for summary judgment has convinced us that the district court erred in denying, in its entirety, the defendants' motion.[10] After reviewing all of the constitutional claims at issue, including the asserted right of access, we conclude that only the MPRP's and its employees' right to be free from retaliation for the exercise of first amendment rights outside the prison was a clearly established right of which a reasonable prison official would have known at the time of the 1980 bans. The defendants were entitled to qualified immunity as to each of the other claims made by the MPRP and its attorneys and paralegal.

 A defense of qualified immunity from suits alleging violations of constitutional rights is available to public officials, including federal prison administrators. *Procunier v. Navarette,* 434 U.S. 555, 561, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978); *see, e.g., Azeez v. Fairman,* 795 F.2d 1296, 1301 (7th Cir.1986). Qualified immunity for government officials is designed to strike a balance between the competing concerns of allowing recovery in damages for the vindication of constitutional rights and "the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.'" *Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982) (quoting *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed.2d 1363 (1950)). Qualified immunity provides not only a defense from liability, but also "an entitlement not to stand trial or face the other burdens of litigation...." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). "The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.; see Darryl H. v. Coler,* 801 F.2d 893, 908 (7th Cir.1986).

 The standard against which to evaluate claims of qualified immunity is an objective one, thus permitting the resolution of insubstantial claims on the defendant official's motion for summary judgment. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. The proper inquiry is whether the prison officials violated "clearly established statutory or constitutional rights of which a reasonble person would have known." *Id.* The *Harlow* Court explained:

On summary judgment, the judge appropriately may determine, not only the cur-

---

9. At the hearing on the defendants' motion for summary judgment, the district court judge expressed his understanding that the constitutional right at issue was the "right of the attorneys to see their clients...." Motion for Summary Judgment Tr. at 15. This "right of access" was the only asserted right discussed during the summary judgment conference.

10. Because the district court erred in denying, in its entirety, the defendants' motion for summary judgment on the qualified immunity issue, it necessarily follows that the court erred in denying the defendants' motion for a directed verdict on the same issue.

rently applicable law, but whether that law was clearly established at the time an action occurred. If the law at the time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful. Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.

*Id.* at 818–19, 102 S.Ct. at 2738 (footnotes omitted).[11]

■ The Supreme Court further elucidated the qualified immunity inquiry in the recent case of *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). In *Malley,* the Court stated that, with respect to a claim that a police officer caused the unconstitutional arrest of the two plaintiffs because he obtained a warrant unsupported by probable cause, "[d]efendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." 475 U.S. at ——, 106 S.Ct. at 1096. This qualified immunity inquiry is equally applicable to the actions of the defendant prison officials. The defendants are immune if, on an objective basis, it is obvious that a reasonably competent prison official could have concluded that the bans did not violate the plaintiffs' clearly established constitutional

rights. Therefore, if prison officials of reasonable competence could disagree as to whether the bans violated the plaintiffs' rights, immunity should be recognized.

### C. *Application of the Qualified Immunity Standard to the Claims Asserted*

In *Mitchell,* the Supreme Court set forth the scope of appellate review of a denial of qualified immunity:

An appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim. All it need determine is a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, in cases where the district court has denied summary judgment for the defendant on the ground that even under the defendant's version of the facts the defendant's conduct violated clearly established law, whether the law clearly proscribed the actions the defendant claims he took.

472 U.S. at 528, 105 S.Ct. at 2816.

#### 1. Institutional Security Concerns

The law as it existed in 1980 clearly recognized that prison administrators should be afforded substantial deference in matters of institutional security. In *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court described the necessary balance between restrictions on individual rights and prison security concerns:

[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees. "[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities them-

---

**11.** This court has recognized that the district court faced with a qualified immunity defense must engage in a two-part analysis. The court must ask 1) whether the alleged conduct amounts to a violation of constitutional rights; and 2) whether the constitutional standards were clearly established at the time of the alleged conduct. *Wade v. Hegner,* 804 F.2d 67, 70 (7th Cir.1986).

selves." *Pell v. Procunier,* [417 U.S. 817, 823 [94 S.Ct. 2800, 2804, 41 L.Ed.2d 495] (1974) ]; *see Jones v. North Carolina Prisoners' Labor Union,* [433 U.S. 119, 129 [97 S.Ct. 2532, 2539, 53 L.Ed.2d 629] (1977) ]; *Procunier v. Martinez,* 416 U.S. 396, 412 [94 S.Ct. 1800, 1811, 40 L.Ed.2d 224] (1974). Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry. Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security. *Jones v. North Carolina Prisoners' Labor Union, supra,* [433 U.S.] at 129 [97 S.Ct., at 2539]; *Pell v. Procunier, supra,* at 822, 826; *Procunier v. Martinez, supra,* [416 U.S.] at 412–414 [94 S.Ct., at 1810–12].

\* \* \* \* \* \*

Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. *Jones v. North Carolina Prisoners' Labor Union, supra,* [433 U.S.] at 128 [97 S.Ct., at 2539]; *Procunier v. Martinez, supra,* [416 U.S.] at 404–405 [94 S.Ct., at 1807]; *Cruz v. Beto,* [405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) ]; *see Meachum v. Fano,* 427 U.S. [215], 228–229 [96 S.Ct. 2532, 2540, 49 L.Ed.2d 451]. "Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier,* 417 U.S., at 827 [94 S.Ct., at 2806].

441 U.S. at 546–48, 99 S.Ct. at 1878–79.

The Supreme Court has recently reaffirmed the principle deference to the de-terminations of prison officials in matters of institutional administration. *See O'Lone v. Estate of Shabazz,* —— U.S. ——, 107 S.Ct. 2400, 2407, 96 L.Ed.2d 282 (1987) ("We take this opportunity to reaffirm our refusal, even where claims are made under the First Amendment, to 'substitute our judgment on ... difficult and sensitive matters of institutional administration,' ... for the determinations of those charged with the formidable task of running a prison.") (quoting *Block v. Rutherford,* 468 U.S. 576, 588, 104 S.Ct. 3227, 3233, 82 L.Ed.2d 438 (1984)); *Turner v. Safley,* —— U.S. ——, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if 'prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations.' ") (quoting *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977)). Nor is this approach to institutional restrictions on constitutional rights limited only to the rights of prisoners. The Court in *Wolfish* noted that "[w]hile those cases [*Jones v. North Carolina Prisoners' Labor Union, Pell v. Procunier* and *Procunier v. Martinez* ] each concerned restrictions governing convicted inmates, the principle of deference enunciated in them is not dependent on that happenstance." 441 U.S. at 547 n. 29, 99 S.Ct. at 1878 n. 29. Mindful of the foregoing, we turn to an examination of the alleged violations of constitutional rights asserted by the plaintiffs.

2. Constitutional Claims

■ In evaluating the constitutional rights asserted by the plaintiffs against a defense of qualified immunity, we must first ask whether the rights asserted were clearly established constitutional rights of which a reasonable prison official would have known in 1980. *See Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. Moreover, this court has recognized that the rights asserted must be tailored to the factual circumstances in which the alleged violations oc-

curred.[12] *See, e.g., Colaizzi v. Walker,* 812 F.2d 304, 307–08 (7th Cir.1987); *Kompare v. Stein,* 801 F.2d 883, 887 (7th Cir.1986); *Azeez,* 795 F.2d at 1301; *Benson v. Allphin,* 786 F.2d 268, 275–76 (7th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986). We recently explained:

> [The *Harlow* qualified immunity] test would have little bite if a right "clearly established" *at any level of generality* could survive it. "The words 'clearly established . . . constitutional rights' may not be used to read the defense of immunity out of federal tort law by the facile expedient of stating constitutional rights in the most general possible terms, so that anyone who prevails on the merits of a claim based on (for example) the First Amendment's free exercise of religion clause, however novel that claim is, can defeat the defense of immunity simply by pointing out that the right to the free exercise of one's religion has long been a clearly established constitutional right. The right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful."

> \* \* \* \* \* \*

> Our conclusion is that the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted.

*Colaizzi,* 812 F.2d at 307–08 (emphasis in original) (quoting *Azeez,* 795 F.2d at 1301).

"The general rule of qualified immunity is intended to provide government officials with the ability 'reasonably [to] anticipate when their conduct may give rise to liability for damages.'" *Anderson v. Creighton,* —— U.S. ——, ——, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987) (quoting *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012 (1984)). It follows that the right allegedly violated may not be asserted at any level of generality. Rather,

> the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, . . . but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Id.* —— U.S. at ——, 107 S.Ct. at 3039 (citations omitted).

▮ What is important, in the final analysis, is "whether the legal norms governing [the government official's] behavior were clearly established at the time of the challenged actions." *Wade v. Hegner,* 804 F.2d 67, 71 (7th Cir.1986) (citing *Mitchell,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411). To determine whether such legal norms existed at the pertinent time, we often refer to closely analogous case law, decided before the public official acted or failed to act. *Kompare,* 801 F.2d at 887; *Lojuk v. Johnson,* 770 F.2d 619, 628 (7th Cir.1985), *cert. denied,* 474 U.S. 1067, 106 S.Ct. 822, 88 L.Ed.2d 795 (1986). Of course, in analyzing those cases, precise factual congruity is not required.

The MPRP and its employees have asserted a first amendment right to speak out publicly about the conditions at Marion and to pursue litigation aimed at changing

---

**12.** The district court misapprehended the "clearly established" requirement. In the jury instructions conference, the court stated: I think in *Harlow* and those other cases where they talk about good faith immunity, the law has to be settled, . . . and *I think what they are talking about is overall, or the overriding right or the law that we are talking about.* For example, free speech, there isn't any question about the constitutional right to free speech. In the particular context we have here, it may not have been decided that a paralegal for a prisoners rights organization has the right to free speech to talk about conditions in the prison, but we all agree that there is no case that has decided that specifically, but if that were true, if we had to talk about the context of each case, there would never be a case, and I should say in every case you would have good faith immunity because you would have a case on all fours with the case that you have before you or else you would have to say that good faith immunity applies. Tr. at 1602–03.

those conditions. The MPRP employees have also asserted a due process right to practice their profession without undue government interference. Similarly, the MPRP has claimed a right to carry out its purpose without undue government interference. While couched in first and fifth amendment terms, the essence of these claims in the factual circumstances presented is that the MPRP and its employees had a constitutional right of access to Marion during the work strike in order to gather information about the conditions inside, to pursue litigation to change those conditions, to practice law in the manner they chose, and to carry out the corporate purpose of the MPRP. Stated more specifically, the MPRP and its employees were asserting a right to speak out about the conditions at Marion, to litigate to change those conditions, and to practice their profession by entering the prison to visit with prisoners during a work strike that threatened the security of the institution when the prison officials had evidence to indicate that the MPRP and its employees were, at the least, encouraging the work strike.

■ The plaintiffs bear the burden of establishing the existence of the allegedly "clearly established" constitutional rights. *Davis v. Scherer*, 468 U.S. 183, 197, 104 S.Ct. 3012, 3021, 82 L.Ed.2d 139 (1984). "A plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that those rights were clearly established at the time of the conduct at issue." *Id.* Here, the

plaintiffs failed in their burden to show that there was a clearly established constitutional right of access to a prison experiencing a threat to its security in order to effectuate the plaintiffs' first and fifth amendment rights. We hold that the district court erred in not granting summary judgment or a directed verdict in favor of the defendants on these claims.[13]

■ The MPRP and its employees have claimed a right to be free from retaliation for the exercise of their first amendment rights to speak out publicly about the conditions at Marion and to litigate to change those conditions. This claim can be distinguished from that involving a right of access to Marion inasmuch as the Project and the attorneys and paralegal are protected by the first amendment for their speech and litigation efforts *outside the prison.* The right to be free from retaliation for the exercise of constitutional rights was clearly established in 1980 when the prison officials banned the MPRP staff from Marion. *See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (cause of action where defendant refused to rehire plaintiff because he exercised rights protected under the first amendment); *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) (government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech"); *Pickering v. Board of Educ.*, 391 U.S. 563, 574, 88 S.Ct. 1731,

---

13. The inmate plaintiffs claimed violations of a first amendment right of association through membership on the MPRP board of directors and of a right to be free from retaliation for the exercise of that right. They also claimed violations of their right to access to counsel and to the courts. Only the latter was presented to the jury and the jury found in favor of the defendants on that claim. The plaintiffs do not argue in their cross-appeal that the court erred in failing to give a jury instruction on the former claim. The cross-appellants have thus waived that claim.

The cross-appellants contend that the district court erred in denying their motion for judgment n.o.v. as to the inmate plaintiffs. Yet, they assert no legal basis for this argument; they merely reiterate evidence presented at trial. We

conclude that this argument is without merit and that the jury verdict should stand as to the inmate plaintiffs. Because we have been presented with no reason to doubt the jury's verdict as to the inmates' claim of a violation of their right to access to counsel and to the courts, we need not engage in an analysis of whether the right asserted by the inmate plaintiffs was clearly established for the purpose of determining whether the qualified immunity defense should have applied to the claim.

The cross-appellants' arguments that the district court erred in refusing to certify a class of prisoner plaintiffs, in refusing to expunge the prison records of certain prisoner plaintiffs, and in refusing to impose sanctions on the defendants are similarly without merit.

1737, 20 L.Ed.2d 811 (1968) (holding that "a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment"); *Buise v. Hudkins,* 584 F.2d 223, 229 (7th Cir.1978), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979) (noting that "it is well established that an act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for a different reason, would have been proper"). Reasonably competent prison administrators would have known that they could not ban the MPRP and the individual attorneys and paralegal in retaliation for the exercise of their first amendment rights outside the prison. Accordingly, the appellants are not entitled to a defense of qualified immunity on a claim that they retaliated against the MPRP and its employees for the exercise of their first amendment right to free speech through speaking out publicly about the conditions at Marion or through litigation aimed at changing those conditions.

### D. *Retaliation Claim*

Because the MPRP's, attorneys' and paralegal's claims of retaliation are not subject to a qualified immunity defense, we must determine if the jury's verdict in favor of the attorneys and paralegal, and against the MPRP,[14] can be sustained on the retaliation theory. We hold that the verdict in favor of the attorneys and paralegal cannot.

#### 1. Waiver

■ The plaintiffs argue before us that their theory of the case at trial was one of retaliation for the exercise of protected rights. To avoid waiver of the retaliation theory, the plaintiffs must have presented the theory at trial and attempted to insure that the jury was properly instructed on it. Even if the plaintiffs presented the theory at trial, they will be held to have waived it if they did not object to inadequate or faulty retaliation instructions given by the court, or did not proffer a retaliation in-

struction of their own. Unless the plaintiffs objected to the instructions given and proposed a retaliation instruction, " '[i]t is well-settled law that a party cannot complain of errors which it has committed, invited, induced the court to make, or to which it consented.' " *Strauss v. Stratojac Corp.,* 810 F.2d 679, 684 (7th Cir.1987) (quoting *Weise v. United States,* 724 F.2d 587, 590–91 (7th Cir.1984)). Moreover, we have noted that " 'in a civil case each party must live with the legal theory reflected in instructions to which it does not object.' " *Davis v. Consolidated Rail Corp.,* 788 F.2d 1260, 1268 (7th Cir.1986) (quoting *Will v. Comprehensive Accounting Corp.,* 776 F.2d 665, 675 (7th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986)).

■ As previously discussed, the plaintiffs' "New Second Amended Complaint" adequately alleges retaliation claims on behalf of the MPRP and the attorney and paralegal plaintiffs. *See supra* Part II A. We also note that, at trial, the plaintiffs invoked the right of the MPRP and the attorneys and paralegal to exercise their first amendment rights outside the prison free from retaliation. In his opening statement on behalf of the plaintiffs, Mr. Deutsch stated:

> [W]e believe as the evidence will show that the prison was committed to keeping these lawyers out not because they caused a security risk to the prison, not because they had a problem with that, because they didn't want them doing their work, they didn't want them speaking out, they didn't want them explaining to the people what was going on, and they didn't want them challenging these lawsuits.

Tr. at 83. In closing arguments, another of plaintiffs' counsel, Mr. Cunningham, referred to the "basic rights of the lawyers to freedom of speech and to practice their profession...." *Id.* at 1650. Mr. Cunningham then spoke more specifically about the free speech rights of the attorneys: "The lawyers have the right to be

**14.** *See infra* note 15.

critical of the prison and to act on that criticism.... They have the right to speak out against what they think is wrongdoing on the part of the government, and they have the right to speak out in lawsuits, in the press, in meetings and community groups, any other way they see fit." *Id.* at 1651. He further stated that "they had a right to practice their profession ... and they had the right to free speech without unreasonable or arbitrary interference by the government." *Id.* at 1652. Mr. Cunningham then stated four separate times that Mr. Thomas-Bey's meeting with Ms. Abel and Ms. Easter-Wells (on which the prison administrators based their ban of the two MPRP attorneys) and the allegations used to extend the ban to all MPRP attorneys were pretextual: "It was a pretext to silence the critics of the prison administration." *Id.* at 1661. "They hoked these bans up in order to get rid of critics, but they couldn't do it directly because [the MPRP attorneys] had the right to file a lawsuit, they had the right to speak against [the prison officials]." *Id.* at 1664–65. The plaintiffs also presented sufficient evidence that, if credited by the jury, would support a finding that the asserted bases for the ban were pretextual and that the attorneys and paralegal had been banned because of their criticism of the prison administrators through public comments and prisoners' rights litigation. *See, e.g., id.* at 507, 512–13, 525–26, 534, 572, 600–06, 1149–50, 1373.

██ The retaliation theory was not waived at the jury instructions conference. The plaintiffs did object to the district court's jury instructions on the constitutional rights claimed by the plaintiffs. *Id.* at 1588. Both parties tendered requested jury instructions that, although inartfully drafted, were sufficient to place the trial judge and the defendants on notice that retaliation was a theory of recovery that the plaintiffs wished to present to the jury. It is clear that the district court and the parties knew that retaliation was a theory

of the case. *See* Post-trial Motions Hearing Tr. at 28–29 (Mar. 22, 1985); Post-trial Motions Hearing Tr. at 61 (Aug. 2, 1985).

The record will not support a principled determination that the MPRP and the attorney and paralegal plaintiffs have waived a theory of retaliation. Moreover, on the record, we cannot say that the plaintiffs invited or induced the district court to err in failing to properly instruct the jury or that they have consented to a waiver of the retaliation theory of the case. *See Stratojac,* 810 F.2d at 684; *Davis,* 788 F.2d at 1268.

2. Confusion of the Claims

██ Even though the retaliation claim was not waived, the verdicts in favor of the attorney and paralegal plaintiffs cannot stand.[15] Despite the defendants' objections, the trial judge refused to remove from the case those theories of recovery upon which the defendants were entitled to qualified immunity. Consequently, the case was submitted to the jury on instructions that permitted the jury to return a verdict for the plaintiffs on any one of a number of theories, some of which should have been removed from the case on the ground of qualified immunity. It is therefore impossible for us to discern whether the verdict rests on a theory of retaliation, the only theory not subject to the qualified immunity defense. Indeed, the trial judge acknowledged this problem when, during the second post-trial motions hearing, he said:

I think the jury—well, of course, we really don't know exactly the theory upon which the jury awarded damages to the lawyer plaintiffs. I think it's more probable that they felt that the lawyers had a right to go in, and of course, that's why I have difficulty with this whole case, because I am not too sure that the lawyers have the right, it's the prisoners that

---

15. The jury found against the MPRP on all counts. As we have noted above, all plaintiffs—including the MPRP—objected to the adequacy of the instructions at trial. However, on cross-appeal, the MPRP does not raise the adequacy of those instructions. Therefore, we decline to

disturb the jury verdict against the MPRP in this regard. *See American Can Co. v. Mansukhani,* 814 F.2d 421, 425 (7th Cir.1987); *Sanchez v. Miller,* 792 F.2d 694, 703 (7th Cir.1986); *Libertyville Datsun Sales, Inc. v. Nissan Motor Corp.,* 776 F.2d 735, 736–37 (7th Cir.1985).

have the right, by finding against the prisoners, they are saying that their rights weren't violated.

Post-trial Motions Hearing Tr. at 61 (Aug. 2, 1985).

Accordingly, because we cannot determine whether the verdict was based on a theory upon which recovery was barred by the doctrine of qualified immunity or on a theory of retaliation for the exercise of first amendment rights, that verdict cannot stand. The judgment in favor of the attorney and paralegal plaintiffs is therefore vacated and the case remanded for a new trial on the retaliation claim.

### Conclusion

A final word of caution is appropriate. As we have already noted, the record in this case evidences anything but the careful attention to detail required in a case of this complexity. In any further proceedings, that course of proceeding must be altered for the better. Issues should be precisely and frankly identified early in the litigation. Factual submissions must be carefully developed and clearly presented. The trial court's rulings should be made with sufficient precision to allow adequate and expeditious review in this court. All of these tasks will require the co-operation of the trial court and counsel.

For the foregoing reasons, we affirm in part, vacate in part, and remand this case to the district court for a new trial on the attorneys' and paralegal's retaliation claims.[16] Because a retrial may be had on plaintiffs' retaliation theory, Rule 36 automatically applies.

IT IS SO ORDERED

---

**16.** Because of our disposition of the case, we find it unnecessary to address the appellants' argument that the jury verdicts were inconsistent and excessive, and the cross-appellants' argument that the district court erred in not instructing the jury on punitive damages.